# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ANGELA BRANFORD**, | Case No. 3:17-cv-94-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **WASHINGTON COUNTY, OREGON; PAT GARRETT; JONATHAN CHRISTENSEN; JOHN BLACK, and THE CITY OF PORTLAND, OREGON; and JEFFREY MYERS**, | |
| Defendants. | |

Daniel Snyder, Carl Post, and John David Burgess, LAW OFFICES OF DANIEL SNYDER, 1000 SW Broadway, Suite 2400, Portland Oregon, 97205. Of Attorneys for Plaintiff.

Karen O'Kasey, HART WAGNER LLP, 1000 SW Broadway, Twentieth Floor, Portland, Oregon 97205. Of Attorneys for Defendants Washington County, Pat Garrett, and John Black.

Jonathan Christensen, *pro se*.

**Michael H. Simon, District Judge.**

Plaintiff Angela Branford, a former deputy in the Washington County Sheriff's Office

("WCSO"), asserts claims under 42 U.S.C. § 1983; Title VII of the Civil Rights Act, 42 U.S.C.

§ 2000e *et seq*.; and Oregon state law against Washington County ("the County"), Washington

County Sheriff Pat Garrett, and WCSO employees or former employees Jonathan Christensen

and John Black.[1] (Defendants Washington County, Pat Garrett, and John Black, but excluding

Jonathan Christensen, are collectively referred to as the "Washington Defendants.") The

Washington Defendants move for summary judgment against all of Branford's claims against

them. In response, Branford concedes her state law claim alleging breach of confidentiality and

her claims against the County (but not against Defendants Garrett, Black, and Christensen) for

violations of her constitutional rights under 42 U.S.C. § 1983. Branford cross-moves for partial

summary judgment on her claim of battery against Defendant Christensen. For the reasons that

follow, the Court grants in part and denies in part the motion filed by the Washington Defendants

and grants Branford's motion for partial summary judgment against Christensen.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

---

[1] The Court previously ruled that City of Portland Detective Jeffrey Myers is entitled to qualified immunity and declined to exercise supplemental jurisdiction over Branford's remaining state law claims against the City of Portland.

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND[2]

Angela Branford previously worked as a jail deputy in the Washington County Sheriff's Office for almost ten years, from July 2008 until June 2018.[3] ECF 82-1 at 2. In 2010, Branford passed her probationary period and became a permanent deputy sheriff. From the time she began her employment until the filing of her complaint, Branford was not subjected to any formal disciplinary procedures and received only positive or satisfactory job performance reviews. The WCSO certified Branford only as a jail deputy and never as a patrol deputy, and she worked exclusively in the Washington County Jail. ECF 82-1 at 2. Branford, however, received cross-training in law enforcement skills, such as room-clearing, handling high-risk stops, and crisis

---

[2] The Court draws these facts from the depositions, answers to interrogatories, reports, and other documents submitted by the parties. At this time, the Court overrules the evidentiary objections raised by the Washington Defendants. The Court, however, only considers evidence that is relevant to Branford's claims as alleged in her First Amended Complaint when deciding the Washington Defendants' motion for summary judgment. *See Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1096 (D. Or. 2015) ("Federal Rules of Evidence 401, 402, and 403 are duplicative of the summary judgment standard.").

[3] The termination of Branford's employment is not at issue in this lawsuit.

negotiation, and she was issued a service firearm that she was required to wear while on duty and in uniform outside of the secure perimeter of the jail. ECF 94 at 2-3.

The WCSO has a predominantly male workforce. Branford describes the WCSO as having a "long history" of "comments, remarks, and behavior by . . . male supervisors and coworkers . . . that were offensive in nature and based on sex and gender." ECF 94 at 3. She describes a working environment permeated with joking of a frank sexual nature or involving sexual innuendo. *Id.* During her employment at the WCSO, Branford alleges that she was subjected to numerous instances of sexual harassment and sexual assault and that this harassment was so severe that it constituted a hostile work environment. In her First Amended Complaint, Branford describes harassment by the following employees of the WCSO: Sergeant Kelly Degman, Sergeant Daniel Cardinal, Sergeant Jonathan Christensen, Sergeant Shane Siemiller, and Deputy Justin Ulrich, as described more fully below. She also complains of retaliation for reporting several instances of sexual harassment.

## A.  Sergeant Kelly Degman

In October or November of 2011, Branford became upset with Sergeant Kelly Degman because he was making crude comments to coworkers at work about her personal and private life. During a smoke break, Branford told Sergeant Red Wortham that Sergeant Degman was making inappropriate comments and crude jokes to coworkers about Braford's consensual relationship with another WCSO employee. ECF 82-1 at 9; ECF 96-3 at 8; ECF 96-3 at 6. As she explains, however, Branford did not want Wortham to report Degman's behavior to command staff because Degman was "well-liked and [Branford] didn't want [Degman] to be retaliated against, [Branford] just wanted [Degman] to stop" joking about her. ECF 102-3 at 11. Branford believes that Wortham eventually spoke to Degman about his behavior. ECF 82-1 at 12. After

Branford spoke to Wortham, and Wortham spoke to Degman, Degman stopped making inappropriate comments about Branford's relationship.

Sometime in 2012, however, Degman made an offensive comment about Branford's underwear to an inmate in the Washington County Jail in the presence of Branford. ECF 94 at 7; ECF 82-1 at 11. Branford and Degman were working with a mentally ill inmate, who began talking about what color underwear Branford must have been wearing that day. Degman told the inmate, "No, you have it all wrong. She wears crotchless panties." ECF 82-1 at 54. Branford did not report Degman's comment to any WCSO supervisors or to WCSO human resources or file a complaint at the time. ECF 82-1 at 11.

In June 2016, Branford sent an email to Sheriff Garrett in which she complained of policy violations committed by Degman, although it is not clear to which specific events she was referring. ECF 82-1 at 55. In July of 2016, the WCSO investigated Branford's complaints about Degman. Branford met with Shawn Fisher, a WCSO employee in the Services Division, and the two of them discussed Degman's comments. ECF 82-1 at 56. It is unclear what was the outcome of the investigation.[4] Branford also states in her responses to interrogatories that she did not report Sergeant Degman to WCSO before filing her lawsuit. ECF 82-10 at 3.

## B.  Sergeant Daniel Cardinal

In 2014, Sergeant Daniel Cardinal asked Branford when he would get to see her breasts. She responded, that was not going to happen. ECF 94 at 11-12. She also describes an incident in late 2014 or early 2015 in which Sergeant Cardinal contacted her at home while he was on duty and out on patrol. Cardinal ask Branford if he could come to her home to use her bathroom. ECF 94 at 16. She agreed. When Cardinal arrived at Branford's home, Cardinal exposed himself

---

[4] The Court was not provided with the documents, which appear to be exhibits 132 and 135 to Branford's deposition, that describe the outcome of this investigation.

to her and asked if she wanted to play with his genitals. She declined. Branford also alleges that Cardinal stated at the time, "It's nice, isn't it." ECF 82-10 at 5. Branford did not report this incident to the WCSO, but she did disclose it to investigators from the Portland Police Bureau in the spring of 2015. ECF 94 at 17.

## C. Sergeant Jonathan Christensen

Branford met Sergeant Christensen through her work for the WCSO when he led a training session for WCSO staff. ECF 94 at 14. Sometime in 2013 or 2014, Branford and Christensen began a consensual romantic and sexual relationship. During the course of the relationship, Branford described Christensen's behavior as growing more controlling. ECF 94 at 15. Branford attempted on several occasions to end her relationship with Christensen but was unsuccessful. ECF 94 at 15.

On March 7, 2015, while Sergeant Christensen was on duty, he drove his patrol car to Branford's home. ECF 94 at 18. Christensen demanded that Branford let him into her home, but she refused, stating that she wanted to end their relationship. ECF 94 at 18. The two got into a heated argument. Christensen put his hands around Branford's neck and choked her until she promised that she would continue to have a relationship with him. ECF 94 at 18.

On April 17, 2015, Sheriff Garrett and several other Washington County officials received an anonymous email, detailing allegations of inappropriate sexual behavior by three employees of the WCSO: Jonathan Christensen, Daniel Cardinal, and Nick Markos. ECF 82-2 at 3. A similar email was sent to a local newspaper, and the newspaper published an article describing inappropriate sexual behavior by WCSO employees.

The anonymous email was sent on a Friday, and sometime early the following week, the WCSO determined that a thorough investigation by an outside law enforcement agency would be appropriate. The WCSO referred the investigation of Christensen, Cardinal, and Markos to the

Portland Police Bureau ("PPB"). ECF 82-2 at 3. PPB Detectives Myers and Wollstein were assigned to conduct the investigation of Christensen.

During the PPB investigation of Christensen, Detectives Myers and Wollstein interviewed Branford. During the interview, Myers requested Branford's cell phone. Branford did not want to give Myers her cell phone because it contained personal and intimate information and material that she believed was not relevant to the investigation. Myers promised Branford that if she allowed him to copy the hard drive from her cell phone, a copy of the phone's hard drive would never be shared with anyone else. According to Branford, Myers told Branford that anyone who needed to view the contents of her phone would only be permitted to do so at Myers's desk and would not receive a copy of the phone's contents. Branford contends that in the presence of Wollstein and victim advocate Susan Lehman, Myers told Branford, "No one will get a copy of your phone." On either April 27, 2015 or June 27, 2015, Branford signed a consent form allowing PPB to copy of the contents of her cell phone. ECF 82-8 (both dates listed on consent form).

It was during an interview with PPB investigators that Branford revealed for the first time that Christensen had choked her. ECF 82-1 at 24. At the urging of PPB investigators, Branford filed a restraining order against Christensen in June of 2015. Christensen contested the restraining order, and a hearing was held in Lane County Circuit Court. WCSO learned of the choking incident through the Portland Police Bureau investigation and the restraining order proceeding. ECF 82-2 at 5. WCSO immediately opened an investigation into Christensen and placed Christensen on administrative leave while the WCSO investigated Branford's allegations. ECF 82-2 at 7. On August 12, 2015, WCSO terminated Christensen's employment. On July 12,

2016, Christensen pleaded guilty to strangulation constituting domestic violence. See ECF 86-1 at 10.

After the investigation into Christensen began in April of 2015, Branford felt strain, both emotionally and mentally. She took paid leave between April 27 and May 7, 2015. On May 7, 2015, WCSO Undersheriff Mori called Branford and told her that he could no longer keep her on paid leave and that she would need to return to work. Between April and December of 2015, Branford took paid FMLA leave. According to Branford, she did not take any *unpaid* FMLA leave because she had been told by a union representative that taking unpaid leave would adversely affect her seniority at the WCSO.

On May 25, 2016, Branford learned that the contents of her cell phone had been shared with WCSO's internal affairs investigator, Lieutenant John Black, as part of his investigation into Nick Markos, with whom Branford also had a consensual sexual relationship. ECF 82-3 at 12.[5] Branford learned that the contents of her cell phone had been shared with WCSO investigators without her consent.

On May 26, 2016, Branford told Sergeant Arrowood that the PPB had given WCSO's Lieutenant Black access to her cell phone contents and conveyed that she was very upset. According to Branford, Sergeant Arrowood was unsympathetic and told Branford to go home early that day. Arrowood told Branford not to return to work until she spoke to Lieutenant Black about the cell phone issue. ECF 82-10 at 13. On May 30, Branford had a conversation with

---

[5] Sometime between May 25, 2016, and August 15, 2016, Lieutenant Black sent a copy of the confidential data extraction from Branford's cell phone to Elmer Dickens, counsel for Washington County. In preparation for discovery in this case, Dickens sent a copy of the contends of Branford's cell phone to Charles Faulk, a private investigator, so that Faulk could redact personal and sensitive photographs from the copy of the contents of Branford's cell phone. ECF 81 at 2.

Lieutenant Black, in which she told him about the stress that the investigation and the workplace was causing her.

During that conversation, Lieutenant Black asked Branford, "What if I could get you a job completely outside of the Sheriff's Office?" Branford felt threatened by this question. Lieutenant Black explained that he had offered Branford an opportunity outside of the Sheriff's office because "the idea was to give [her] a chance to go to a place that wouldn't cause her to have potentially another meltdown or something[.]" ECF 102-1 at 3-4.

### D. Sergeant Shane Siemiller

At various times in 2014 and 2015, Sergeant Shane Siemiller was Branford's direct supervisor. Branford contends that Sergeant Siemiller said to her, several times during the course of a year and in front of other deputies, "Hey your shoes are untied." ECF 83-1 at 3. This statement would then cause Branford to bend over, and deputies would then stare at her. ECF 94 at 13. The WCSO contends that it first learned about Siemiller's comments after the filing of this lawsuit in 2017. ECF 83-1 at 3. Siemiller states that the comment was part of a "running joke" between Siemiller and Branford relating to Branford's decision to get breast enhancement surgery. *Id.* The WCSO conducted an investigation into the allegation of these comments by Siemiller and concluded that Siemiller violated the WCSO's workplace harassment policies. The WCSO demoted Siemiller and required him to attend counseling.

### E. Deputy Justin Ulrich

In May 2016, Branford attended a firearms training session taught by WCSO Deputy Justin Ulrich. The training session occurred during the criminal investigation into Christensen. Branford told Deputy Ulrich that she was having difficulty focusing because of all of the rumors and talk behind her back about the incident involving Christensen and the related investigation.

According to Branford, Ulrich then said to her, "Why don't I take you in the back of your van and give you something to take your mind off of it." ECF 82-12 at 5.

Branford reported this comment to Sheriff Garrett, and the WCSO conducted an investigation into the incident. *Id.* at 1. During the investigation, Branford met with Sheriff Garett and Lieutenant Black. *Id.* at 3. During the interview, Black asked Branford what kind of relationship she had with Ulrich. When she said she did not have any relationship with Ulrich, Black asked Branford if she was "sure" that she and Ulrich did not text or Facebook each other. The WCSO sustained the complaint against Ulrich, and Sheriff Garrett issued an Imposition of Discipline suspending Ulrich without pay for 60 hours and removing him from any instructor duties for a year. ECF 82-13 at 3-4.

## F. Rumors

Branford contends that after the allegations of sexual misconduct at the WCSO became public, the workplace was full of rumors. Branford was deeply troubled by the gossip about herself and Christensen and felt that there were many rumors about her circulating in the WCSO. The WCSO attempted to take steps to stop these rumors and gossip by sending an email reminding all WCSO employees about privacy issues, but Branford states that the email only made the gossip worse. Additionally, Branford reported that some of her acquaintances were less friendly after her complaint against Christensen became public. Specifically, she describes that WCSO Deputy Tran, who normally was friendly towards her, did not say hello to her at intake one day. She described feeling shunned and ostracized at work as a result of the rumors.

During 2015 and 2016, Branford spoke to other deputies at the WCSO and told them about rumors that she had heard from some individuals that other deputies were upset with her for reporting Christensen's behavior. She attempted to report these rumors to Sergeant Siemiller. According to Branford, Siemiller told her, "People will distance themselves from you and you

can't stop it." Branford Decl. ¶ 91. Siemiller also told Branford, "Its going to happen, just ignore it." Branford also at one point complained to Sheriff Garrett about rumors in the workplace, and Sheriff Garrett sent several emails to WCSO supervisors, instructing them to do everything they could to curtail rumors. ECF 82-2 at 16.

WCSO learned of Siemiller's comment that gossip is "going to happen, just ignore it" from Branford's tort claims notice in 2015, before she filed her lawsuit in 2017. The WCSO investigated Siemiller's comment, and Seimiller stated that he made the comment before learning that Branford had been the victim of abuse, and that Branford's concerns about gossip in the workplace had been extremely vague. The WCSO's investigation absolved Siemiller of misconduct, and the WCSO imposed no discipline on him. ECF 83-2 at 1.

Branford also was the subject of a rumor that she had been sleeping with inmates at the jail. She did not mention these rumors in her complaint, nor did she identify them as an incident of retaliation in her complaint. Sheriff Garrett confirmed, however, that the WCSO did investigate allegations of blonde female employees sleeping with inmates at the Washington County Jail. The employees were discovered to be jail technicians, and the WCSO terminated their employment. Branford is blonde, and also works at the Washington County Jail.

**G. Assignments**

Due to the increased stress and gossip in the workplace, Branford requested assignments that would keep her busy and minimize her interactions with coworkers. She asked Sheriff Garrett if she could be assigned to one of three specific units: the Medical Observation Unit ("MOU"), the Rover One Unit, and the Intake Unit. ECF 82-2 at 16-17, 19. Sheriff Garrett believed that these three posts were among the most stressful assignments within the WCSO. He was concerned that a permanent assignment to one of these posts might worsen Branford's mental health, not improve it. ECF 82-2 at 19. After receiving a letter from Branford's then-

attorney Elizabeth Inayoshi, Garrett agreed temporarily to assign Branford to one of these posts.[6] ECF 82-14. Eventually, at Branford's request, Branford stopped working exclusively at these three high-stress positions and returned to her normal duty station. ECF 82-1 at 52.

## H. Overtime

Branford took paid administrative leave from April 27, 2015 until May 7, 2015, immediately after her initial reporting of Christensen's abuse and the restraining order proceeding. On May 7, 2015, Branford received a phone call from WCSO Undersheriff Mori, who told her that she could not remain on paid administrative leave indefinitely and needed to return to work on May 8, 2015. Upon her return to work, Branford checked her schedule and noticed that the overtime shifts that she had signed up for in May and June, before taking leave, had been reassigned to other employees. Branford was able to secure overtime shifts during this time period as they became available. In 2015, Branford worked 152 hours of overtime, approximately the same number of overtime hours that she worked in 2014 (159 hours). Branford reported that throughout the rest of 2015 and early 2016 it appeared to her as though overtime shifts that she recalled signing up for had been assigned to other employees, forcing her to accept other shifts as they became available, rather than her first-choice overtime shifts. Sergeant Mackley is responsible for scheduling overtime at the WCSO. ECF 102-3 at 9. In 2016, Branford worked 234 hours of overtime, which is consistent with other jail staff. ECF 80 at 2. Branford did not raise her concerns about missing overtime shifts with anyone in command staff at the WCSO. ECF 102-3 at 9.

---

[6] Branford characterizes her assignment to these posts as an accommodation for her disability. She does not, however, assert any disability-related claims in this lawsuit.

**DISCUSSION**

**A. Washington Defendants' Motion for Summary Judgment**

    **1. Hostile Work Environment**

Branford brings claims under Title VII, 42 U.S.C. § 2000e, and Or. Rev. Stat. § 659A.030, alleging that she was discriminated against on the basis of her gender.[7] Because Oregon law parallels that of Title VII, it is appropriate to consider Branford's federal and state claims together. *See Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1242 (D. Or. 2015) ("The substantive analysis for discrimination under Title VII of the Civil Rights Act (42 U.S.C. § 2000e–2(a)) and ORS § 659A.030(b) is substantially similar, and courts often analyze such claims together.").

Title VII of the Civil Rights Act prohibits employment discrimination based on "race, color, religion, sex, or national origin." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). An employer violates Title VII by, among other things, offering terms or conditions of work to employees of one gender that are less favorable than those the employer offers to employees of another gender. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). Examples include refusing to hire on account of gender or paying less for the same work, imposing more onerous duties for the same pay, or otherwise permitting less favorable working conditions, based on gender. *Id.* Harassment of an employee based on the employee's gender, *i.e.* sexual harassment, is prohibited sex discrimination if committed or tolerated by the employer because the harassment becomes a "new and onerous term of

---

    [7] In her response to the Washington Defendants' Motion for Summary Judgment, Branford characterizes both her Title VII claim and her Or. Rev. Stat. § 659A.030 claim as hostile work environment claims. Although the Washington Defendants also move for summary on a non-hostile-work-environment-based claim of gender discrimination under Or. Rev. Stat. § 659A.030, it does not appear that Branford intended her §659A.030 claim to be anything other than a hostile work environment claim. *See* ECF 93 at 26.

employment." *Id.*; *see also Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001) ("By tolerating sexual harassment against its employees, the employer is deemed to have adversely changed the terms of their employment in violation of Title VII.").

"Sexual harassment falls into two major categories: hostile work environment and *quid pro quo*." *Brooks*, 229 F.3d at 923. "A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed. A *quid pro quo* claim, as the name implies, occurs when a supervisor demands sexual favors in return for a job benefit." *Id.* In addition, "employees who are subject to adverse employment actions because they lodged complaints of sexual harassment can raise a retaliation claim under Title VII." *Id.*

To prevail on a claim alleging hostile work environment, a person must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks and citations omitted); *see also Dawson v. Entek Intern*, 630 F.3d 928, 937-38 (9th Cir. 2011) ("A plaintiff may establish a sex hostile work environment claim by showing that he was subjected to verbal or physical harassment that was sexual in nature, that the harassment was unwelcome and that the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment."); *Swenson*, 271 F.3d at 1191 ("To prove a hostile work environment claim, a plaintiff must demonstrate conduct sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (alteration, quotation marks, and citation omitted).

The Court uses "a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment." *Brooks*, 229 F.3d at 923. "The working environment must both subjectively and objectively be perceived as abusive." *Brooks*, 229 F.3d at 923 (quotation marks and citations omitted). In other words, a plaintiff must show that a reasonable person would find the work environment to be "hostile or abusive" and that the plaintiff in fact did perceive it to be so. *Dawson*, 630 F.3d at 988 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)); *Brooks*, 229 F.3d at 924 ("When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim.").

Further, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Brooks*, 229 F.3d at 926. (quotation marks and citations omitted). A single incident can suffice to support a hostile work environment claim if the incident is sufficiently severe. *Id.*; *see Freitag v. Ayers*, 468 F.3d 528, 540 (9th Cir. 2006); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002) (holding that "the employer's reaction to a single serious episode may form the basis for a hostile work environment claim").

An employer's liability for harassing conduct is evaluated differently depending on whether the alleged harasser is a supervisor or a co-worker. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th Cir. 2004). For a hostile work environment claim based on harassment by a supervisor, an employer may be held vicariously liable, although the employer's liability may be subject to an affirmative defense. *Id.* When the harasser is a co-worker, however, the plaintiff must prove that the employer "knew or should have known of the harassment but did not take adequate steps to address it." *Id.* (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 875 (9th Cir. 2001).

When there has been harassment by a co-worker, the court considers whether the

harassment was an isolated incident or the result of multiple incidents. As explained by the Ninth

Circuit:

> Because only the employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship. By hypothesis, the employer will have had no advance notice and therefore cannot have sanctioned the harassment beforehand. And, if the employer takes appropriate corrective action, it will not have ratified the conduct. In such circumstances, it becomes difficult to say that a reasonable victim would feel that the terms and conditions of her employment have changed as a result of the misconduct.

*Brooks*, 229 F.3d at 924. As the Ninth Circuit further noted:

> A case involving a single incident of sexual harassment is obviously distinct from one involving a series of incidents, which the employer knows about and does nothing to correct. In such circumstances, the non-action by the employer can fairly be characterized as acquiescence, *i.e.*, having changed the terms and conditions of employment to include putting up with harassment from other employees.

*Id.* at 924 n.4.

In addition, a victim, in proving the existence of a hostile work environment, cannot rely

on the alleged harasser's improper conduct with other female employees that the victim did not

know about at the time of the harasser's conduct directed at her. *Brooks*, 229 F.3d at 924.

"Harassment directed towards others of which an employee is unaware can, naturally, have no

bearing on whether she reasonably considered her working environment abusive." *Id.* As the

Ninth Circuit explained, however:

> The lack of sufficient discipline for an earlier and unknown act of misconduct does not, after all, make the later misconduct more severe or pervasive with respect to the harassed employee. *Lack of adequate discipline might be a relevant consideration in assessing the employer's liability once a hostile work environment is shown*

> *to exist, but it seems to have no logical bearing on whether there is*
> *a hostile work environment in the first place*.

*Id.* at 925 n.5 (emphasis added).

Regardless of whether a claim of hostile work environment is based on a single episode or multiple occurrences, when co-worker harassment is alleged "the employer can be held liable only where its own negligence is a cause of the harassment." *Swenson*, 271 F.3d at 1191 (internal quotation marks and citation omitted). That is because "Title VII liability is direct, not derivative: An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct." *Id.* at 1191-92. Thus, "[i]f the employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have 'adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.'" *Id.* at 1192 (alteration in original) (quoting *Faragher*, 524 U.S. at 789). "On the other hand, an employer cannot be held liable for misconduct of which it is unaware." *Id.*

Finally, "[n]otice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment." *Id.* (internal quotation marks and citation omitted). "This obligation actually has two parts. The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation." *Id*.

### a.   Whether a Hostile Work Environment Existed

The Court identifies the following incidents that Branford argues, when considered in their totality, constitute a work environment that is both subjectively and objectively hostile: (1) Sergeant Degman discussing Branford's private romantic relationship in crude terms; (2)

Sergeant Degman telling a jail inmate in the presence of Branford that Branford wears crotchless panties; (3) Sergeant Cardinal asking Branford if he could see her breasts; (4) Sergeant Cardinal, while on duty, exposing himself to Branford at her home; (5) Sergeant Christensen choking Branford until she agreed to continue a sexual relationship with him; (6) Sergeant Siemiller telling Branford that her shoes were untied to get her to bend over; and (7) Deputy Ulrich propositioning Branford to have sex with him in her van.[8]

Branford reports being very upset during her interviews with the Portland Police Bureau about Christensen's conduct, strongly suggesting that she subjectively perceived his conduct to be offensive. When Ulrich made his offensive comment to Branford, she described in a subsequent email that she "just wanted to leave" and found his comments inappropriate. ECF 83-11; ECF 83-12 at 6. There is sufficient evidence from which a jury could find that Branford subjectively found her workplace to be hostile and that she considered the harassment to be severe and pervasive.

The Court also finds that a reasonable jury could find that Branford's workplace was objectively severe and abusive. Courts have concluded that even a single incident of a coworker exposing himself to a female employee could create a fact dispute as to whether "the alleged misconduct was severe enough to have created an abusive environment." *Rangel v. Am. Med. Response W.*, 2013 WL 1785907 at *3 (E.D. Cal. May 7, 2013). Christensen strangled Branford, Cardinal exposed himself to her, and Ulrich propositioned Branford. Additionally, although less

---

[8] The Court considers the totality of the circumstances of which Plaintiff was aware in considering whether a hostile work environment existed. "Harassment directed toward others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive." *Brooks*, 229 F.3d at 924. Additionally, the Court does not consider Branford's anecdotal evidence about consensual dating relationships between WCSO employees, because a consensual dating relationship between a plaintiff's coworkers does not create a hostile work environment. *See Poff v. Ok. Dep't of Mental Health and Substance Abuse Servs.*, 683 F. App'x 691, 702 (10th Cir. 2017).

severe, Degman's comments about Branford's underwear and Siemiller's comments to Branford to get her to bend over are all offensive and objectionable. Viewing the evidence under a standard of totality of the circumstances, the Court concludes that a reasonable jury could find that a hostile work environment existed.

### b. Liability for Hostile Work Environment

Having concluded that Branford has presented a triable issue on whether she was subjected to a hostile work environment, the Court next must decide whether the County can be held liable for the harassment that Branford experienced. Although courts look to all instances of harassment, whether done by a coworker or by a supervisor, in determining whether a hostile work environment exists, "[a]n employer's liability for harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker." *McGinest*, 360 F.3d at 1119 (considering actions by both coworkers and supervisors in determining whether hostile work environment existed, then analyzing liability separately for coworkers and supervisors).

Neither Cardinal, Christensen, nor Ulrich ever supervised Branford. Although they at times held the title of sergeant, which is a higher rank than Branford's title of deputy, it is not sufficient that an employee merely held a higher rank in order to be a supervisor. "A supervisor is a person who can take tangible employment actions against an employee, including effecting 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 689 (9th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013)).

A supervisor must have "immediate (or successively higher) authority over *the* employee[,]" not just any employee. *Faragher*, 524 U.S. at 807 (emphasis added). Branford worked as a deputy in the jail division. Although sergeants do have the ability to impose some

form of discipline on deputies, they may only discipline deputies within their division. A patrol sergeant may impose discipline on a deputy in the patrol division, but a patrol sergeant is powerless to impose discipline on a deputy in the jail division. ECF 80 at 2. Ulrich, Cardinal, and Christensen were all employed in the patrol division. ECF 80 at 2. Branford could be hired, fired, or otherwise disciplined only by supervisors within the jail division or by the Sheriff or Undersheriff. She could not be hired, fired, or disciplined by a patrol sergeant. Patrol sergeants Cardinal, Christensen, and Ulrich, thus, had no supervisory authority over Branford. ECF 80 at 1-2. Therefore, WCSO is not vicariously liable for their conduct.

A jury could conclude, however, that Sergeant Siemiller, Sergeant Degman, or both were Branford's supervisor at various times because, as jail division sergeants, they were empowered by the employer to take tangible employment actions against the Branford, including imposing a disciplinary suspension for up to 24 hours and issuing letters of reprimand. ECF 80 at 2; *see Vance*, 133 S. Ct. at 2442. Furthermore, jail sergeants have a substantial role in writing the performance evaluations for jail deputies. ECF 82-7; *see Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 739 (10th Cir. 2014) (finding sergeant's responsibility for performance evaluations weighed in favor of sergeant being supervisor within Title VII). In 2015, Sergeant Siemiller contributed to Branford's performance review with high praise, saying that she "has done fantastic work." ECF 87-2 at 9.

### i. Liability for acts of coworkers

An employer may be liable for sexual harassment perpetrated by coworkers if management knew or should have known about the harassment and failed to take adequate steps to address it. *McGinest*, 360 F.3d at 1119. Past misconduct of which an *employee* is unaware, if not adequately disciplined, may "be a relevant consideration in assessing the *employer's* liability once a hostile work environment has been shown to exist." *Brooks*, 229 F.3d 924 n.5 (emphasis

added). Thus, if the WCSO knew of past misconduct visited upon other female employees, yet failed to take adequate action to prevent it from recurring, "the non-action by the employer can fairly be characterized as acquiescence." *Id.* at 924 n.4. The WCSO may, in those circumstances, be negligent if it "knew, or should have known, about the harassment and failed to take prompt and effective remedial action[,]" even if perpetrated by individuals not involved in this lawsuit and against individuals other than Branford. *Reynaga*, 847 F.3d at 689. Thus, if the WCSO knew that its employees, even employees other than those who harassed Branford, were harassing other women in the WCSO workplace, and by failing to take appropriate action acquiesced to that misconduct, the WCSO can be liable for creating a workplace that tolerates harassment, which in turn led to Branford's alleged harassment.

It is, however, insufficient that harassment merely occur in the workplace without adequate discipline for an employer to be held liable. For liability to attach under Title VII, the employer must have failed "to remedy or prevent a hostile or offensive work environment of which *management-level* employees knew, or in the exercise of reasonable care should have known." *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991) (emphasis added). It is undisputed that Branford never reported much of the harassment that she suffered to the management of the WCSO, and it is largely unknown the precise degree to which others who suffered harassment reported it to WCSO management, such that the employer would be on notice.

"A mere title of 'manager' or 'supervisor' does not by itself suffice to impute that employee's knowledge or actions to the employer." *Lamb v. Household Credit Servs.*, 956 F. Supp. 1511, 1516 (N.D. Cal. 1997); *Huston v. Procter & Gamble Paper Prods., Inc.*, 568 F.3d 100, 108 (3d Cir. 2009) (holding that "mere supervisory authority over the performance of work assignments by other coworkers is not, by itself, sufficient to qualify an employee for

management level status"); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715-16 (2d Cir. 1996) (refusing to impute knowledge to employer when notice was given to low-level supervisor who worked outside plaintiff's department).

The term "management-level employee" has not yet been clearly defined under Title VII, but courts have imputed knowledge to employers in several contexts. *See Swinton*, 270 F.3d at 804-05; *Brooks*, 229 F.3d at 925 n.6. First, courts consistently impute knowledge when the person receiving notice of harassment is a "'supervisor[] possessing substantial authority and discretion to make decisions concerning the terms of the harasser's or harassee's employment' such as "authority to counsel, investigate, suspend, or fire the accursed harasser, or to change the conditions of the harassee's employment.'" *Swinton*, 270 F.3d at 804-05 (quoting *Lamb*, 956 F. Supp. at 1517). Because sergeants at the WCSO do not have the authority to hire, fire, or promote employees, and their disciplinary authority is limited to imposing a 24-hour suspension, sergeants are not management-level employees whose knowledge can be imputed to WCSO.

Second, courts have attributed a non-manager's knowledge to an employer "when an employee complains of co-worker harassment to a non-management employee who has general responsibility for passing employment-related complaints up the corporate hierarchy." *Lamb*, 956 F. Supp. at 1517. A complaint to an employee at human resources, for example, would likely be sufficient to attribute knowledge to the employer.

A third route for imputing knowledge to an employer may exist when the harassment is so blatant and pervasive that the employer cannot reasonably claim ignorance. "The sheer pervasiveness of the harassment might support an inference that the employer must have known of it." *Zimmerman v. Cook Cty. Sheriff's Dep't*, 96 F.3d 1017, 1018-19 (7th Cir. 1996); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986) (noting that the record was unclear whether

unwelcome sexual advances "were so pervasive and so long continuing that the employer must have become conscious of them") (quotation marks and alterations omitted). Thus, although Branford did not report most of the instances that she experienced of harassment, if harassment of women generally in the WCSO was so pervasive that management-level employees must have known about it and took no steps to remedy it, the WCSO could be liable for creating (or permitting) a work environment that tolerated harassment.

Before addressing the evidence that could support an inference that the WCSO knew of pervasive harassment, the Court notes that much of the evidence contained in the record is based on or contains hearsay. In evaluating the nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence *could be provided in an admissible form at trial, such as by live testimony.*" *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (emphasis added). In order for Branford to prevail at trial, many witnesses likely would need to testify about events that they personally experienced—not events that they learned about second hand. Because all the second hand and third hand accounts of inappropriate workplace conduct contained in the record could be presented in an admissible form at trial if the individuals directly involved were to testify, the Court will consider evidence submitted at this stage, even though it was presented to the Court largely as otherwise inadmissible hearsay.

The record contains several second hand reports of incidents of sexual harassment in the WCSO that management may or may not have known about. The Court cannot ascertain, from the record evidence alone, whether WCSO management in fact knew about any of the incidents described or mentioned in passing by various individuals in interviews with PPB or depositions taken in this lawsuit. These incidents include an alleged assault by Sergeant Cardinal on Kelly Mardsen in which Cardinal attempted to grope Mardsen's breasts. ECF 95-3 at 13. Sergeant Markos described Marsden telling him about this incident and also described urging Mardsen to report the incident, stating that if she didn't report it, he would because "that stuff cannot continue to happen with Dan, I mean there's just too much going on." ECF 95-1 at 33. This implies that Sergeant Markos may have known of other instances of Sergeant Cardinal behaving inappropriately.

Sergeant Markos also describes an incident in which Dave Bergquist, another WCSO employee, attempted to grab the breasts of a woman named Debbie. ECF 95-1 at 28. Sergeant Markos stated that Bergquist's attempt to grope Debbie wasn't "the first incident where somebody has claimed that Dave [Bergquist] has touched them inappropriately or attempted to grab their breasts. I know Debbie has complained about it, I know other females have." *Id.* Markos learned this information second hand, not from Debbie herself. *Id.* Markos also mentioned that Sergeant Karlyn Degman may have been groped by Bergquist, but Markos recognized that his information "was hearsay, it's another rumor." ECF 95-1 at 28. Dave Bergquist also attempted to force a civilian employee, Missy Moore, to perform oral sex on him at a holiday party and he groped her breast. ECF 95-1 at 14-18, 35. Evidently at this same holiday party, Missy Moore said that somebody named David Lyle had pulled a woman's breast out of the top of the woman's dress, although Moore did not witness it. ECF 95-1 at 13.

Sergeant Wortham also described inappropriate behavior and comments made by Sergeant Degman. In her deposition, she testified that, on numerous occasions in 2011 Degman had called her a bitch and told her that she was part of the "lesbian club," and he refused to stop even after she told him it was offensive. ECF 96-3 at 9. Wortham testified that she reported Degman's comments to the lieutenant and commander at the time, but they took no action. *Id.* at 10. Wortham also described overhearing a deputy say that an inmate had said that Branford had "bulletproof boobs." ECF 96-3 at 13. Sergeant Wortham mentioned that she had filed numerous complaints to the sheriff and undersheriff at the WCSO about the "old boys' network" that exists in the WCSO.[9]

Additionally, there is evidence in the record that numerous women reported that Deputy Nelson had made offensive comments to them and they raised their concerns to WCSO management. WCSO investigated and sustained many of the complaints against Nelson, including that he used to tell women to make him a sandwich. Branford alleged that Nelson frequently told her to "shut [her] man pleaser." Branford also describes Deputy Nelson bragging that as a patrol deputy he would use his official authority to pull over attractive women. Branford states that when another of Deputy Nelson's girlfriends asked to stop seeing him, his response was to smell her hair and tell her that her hair gave him an erection. ECF 94 at 10. Deputy Nelson was investigated and disciplined, but Branford alleges that this discipline was insufficient. Branford also claims that Corporal Kevin Kearns was accused of inappropriately touching another male corporal. ECF 82-10 at 5. Branford reports that an unknown male deputy at a defensive tactics training once asked Branford how large her breasts were. ECF 82-10 at 5.

_____

[9] Sergeant Wortham also describes receiving a package in the mail full of gummy candy shaped like male genitalia, accompanied by a note saying, "eat a bag of dicks." This incident, however, occurred in 2017 and therefore could not have contributed to the harassment that Branford suffered between 2011-2016.

It is unclear from the record just how many of these incidents occurred before Branford's harassment and how many of them were reported to or known by management. It is possible, however, that these incidents, cumulatively, created an environment of harassment so pervasive that management must have known about it. Branford does not cite to any of these specific incidents in the argument section of her brief to show that the WCSO should be held liable for creating or permitting a hostile work environment based on its failure to curb previous incidents of workplace sexual harassment. It is unclear which, if any, of the events described above Branford believes provides sufficient evidence that the WCSO knew or should have known about the pervasive culture of sexual harassment during the relevant time period. The voluminous record in this case is disorganized and without any context in Branford's briefs as to how the numerous incidents mentioned in various record excerpts support her claims. The Court is uncertain as to which incidents happened when, where, to whom, and who knew about them. Notwithstanding this uncertainty, the Court concludes that there are genuine questions of fact remaining in this case about what the WCSO knew and when it knew it and whether it took appropriate actions to curb a widespread workplace culture of sexual harassment, if one existed. The Washington Defendants' motion for summary judgment on Branford's federal and state claims for hostile work environment is, therefore, denied. The Court, however, grants leave to the Washington Defendants to renew this motion at the final pretrial conference. At that time, with Branford's witness list, witness summaries, and intended trial exhibits available, the Court can better determine whether Branford will be able to present admissible evidence at trial sufficient to show that the Washington Defendants knew or should have known of any widespread workplace culture of sexual harassment at the WCSO.

### ii. Vicarious liability for acts by a supervisor

Generally, an employer is vicariously liable for a hostile work environment created by a supervisor. *Nichols*, 256 F.3d at 877. If the employee has not suffered a tangible employment action as a result of the harassment, however, the employer may assert an affirmative defense known as the *Faragher/Ellerth* affirmative defense. This affirmative defense comprises two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see Nichols*, 256 F.3d at 877. "Whether the employer has a stated antiharassment policy is relevant to the first element of the defense." *Nichols*, 256 F.3d at 877. If a complaint procedure exists and the employee fails to take advantage of it, that "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* (quoting *Ellerth*, 524 U.S. at 765).

This affirmative defense is only available to employers if the employee has not suffered a tangible employment action by the harassing supervisor. *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1159, 1167 (9th Cir. 2003). "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761 (emphasis added). "A tangible employment action in most cases inflicts direct economic harm." *Id.* at 762. "[T]he harassing supervisor must be the one who orders the tangible employment action or, at the very least, must be otherwise substantially responsible for the action." *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 44 (1st Cir. 2003).

Branford does not identify any tangible significant adverse employment action that she has suffered at the hands of an allegedly harassing supervisor. Branford describes several actions

that she believes are tangible employment actions, including losing her scheduled overtime shifts, being denied her initial request for shift reassignment, and being ostracized by coworkers. None of these actions, however, was carried out by an allegedly harassing supervisor, either Siemiller or Degman or anyone else. *Id.* Thus, none of these actions rise to the level of a tangible employment action that would preclude the *Faragher/Ellerth* defense. Accordingly, the Washington Defendants have met the prerequisite for the application of this affirmative defense.

To satisfy the first prong of the *Faragher/Ellerth* defense, the WCSO must demonstrate that it took reasonable steps to prevent and correct harassing behavior. During the relevant time period, the WCSO maintained (and continues to maintain) a workplace sexual harassment policy, known as the "harassment-free workplace policy." ECF 82-6. This policy defines "sexual harassment," sets forth a reporting procedure, states that employees who violate the policy will be disciplined and assures employees that no reprisals would be made against them for making a complaint of sexual harassment. ECF 82-6 at 2.

In *Holly D. v. Cal. Inst. of Tech*, 339 F.3d 1158, 1177 (9th Cir. 2003), the Ninth Circuit found that the university's "written policy which defined prohibited behavior, identified contact personnel, and established procedures to investigate and resolve any claims" on its face was reasonable. *See also Nichols*, 256 F.3d at 877 (finding similar policy sufficient to support affirmative defense); *see also Montero v. Agco Corp.*, 192 F.3d 856, 862 (9th Cir. 1999) (same). Branford knew about the harassment-free workplace policy. ECF 82-1 at 58; *see Holly D.*, 339 F.3d at 1177-78 (plaintiff testified that she knew about the policy). The Court finds that WCSO's policy was legally sufficient and that the Washington Defendants have met the first prong of the *Faragath/Ellerth* affirmative defense with regard to the actions of supervisors Siemiller and Degman.

Next, the Court must find that Branford unreasonably failed to use WCSO's harassment-free workplace policy to report sexual harassment. WCSO's workplace harassment policy identifies individuals whom Branford could have contacted about the harassment she was experiencing, including her immediate supervisor, or, "if the offending party is in the complainant's chain-of command or if the staff member feels uncomfortable in reporting the conduct in question to an immediate supervisor, the staff member should report the conduct directly to the Sheriff or to the County's Human Resources office." ECF 82-6. Branford did not report Sergeant Degman's comments until 2016, other than mentioning them to Wortham during a smoke break, and she never made any formal complaint about Sergeant Siemiller's inappropriate comments.

Further, every year on each employee's performance evaluation report, the employee is asked to affirm that she either has or has not "been the subject or a witness to harassment by coworkers" ECF 82-7 at 3. In 2014, Branford affirmed that she had not been the subject or a witness to any such harassment. ECF 82-7 at 3. In 2015, Branford did not check either box on her performance evaluation. Lindsey Dober, a senior administrative specialist, followed up with Branford by email to ask her whether Branford's omission was intentional. ECF 82-7 at 7. Branford responded, apologized, and stated that she did not intend to mark the box for harassment on the form. ECF 82-7 at 7. Thus, Branford was presented with opportunities to report sexual harassment but made a conscious decision not to do so. *See Holly D.*, 339 F.3d at 1178 (finding that the plaintiff unreasonably failed to seek help when university's written policy materials identified individuals "equipped to offer assistance in cases of sexual harassment, but Holly D. made no attempt to seek relief from any person able to put a stop to the harassment").

Branford argues in her response to the Washington Defendants' motion for summary judgment that she had a reasonable fear of retaliation based on her observation of the experiences of other employees who reported harassment. Branford recognizes that a "generalized fear of retaliation cannot justify a failure to report sexual harassment," but she argues that her fear was not generalized because "she had observed other women who did in fact report harassment who were mistreated and retaliated against as a result." ECF 93 at 35 (quoting *Beyer v. Baker Sch. Dist. 5J*, 2005 WL 351936, at 8 (D. Or. Feb. 14, 2005)). Branford, however, fails to identify any evidence or any specific example of retaliation against another to render Branford's belief reasonable. *See Mitchel v. Gen. Elec. Co.*, 689 F.2d 877, 879 (9th Cir. 1982) (noting that "unsubstantiated and conclusory allegations" are insufficient to survive summary judgment).

Although Branford fails to name any of these women whom she claims suffered retaliation after reporting sexual harassment (or otherwise to provide any facts in support of this claim), Branford generally refers to "other employees" and "other women" who were retaliated against after reporting harassment. ECF 93 at 35-36. After thoroughly examining the record, the Court has found no evidence of any other employees being retaliated against after reporting sexual harassment. Despite her attempts to characterize her fears as more than "generalized," that is the level of detail that Branford has provided to the Court. Notwithstanding Branford's alleged fears of retaliation, in 2015 and 2016 she overcame those fears and reported Ulrich and Degman to Sheriff Garrett. Branford has not explained why she feared retaliation regarding some of her complaints of sexual harassment, but not others.

The WCSO did, however, eventually learn of some of the instances of harassment that happened to Branford. In 2015, through Branford's tort claims notice, the WCSO learned of Sergeant Siemiller's inappropriate comments about Branford's "untied shoes." Upon learning of

the comments, WCSO opened an investigation. During that investigation, Siemiller was interviewed and he admitted to making these comments. He was demoted and ordered to attend counseling. Thus, when the WCSO eventually learned about Siemiller's comments, WCSO's "response was swift and certain." *Montero v. Agco Corp.*, 192 F. 3d 856, 863 (9th Cir. 1999). Similarly, in 2016, Branford reported Degman's inappropriate comments to the Sheriff, although it is unclear specifically which of Degman's comments Branford reported. The WCSO opened an investigation, and Branford met with Shawn Fisher to discuss her concerns.

Branford was aware of the WCSO's workplace harassment policy, yet she failed to file complaints about harassment for years. "[W]hile proof that an employee failed to fulfill the . . . obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 778. Therefore, the WCSO successfully established the second prong of the *Faragher/Ellerth* defense by showing that Branford unreasonably failed to take advantage of the WCSO's harassment-free workplace policy when she knew of its existence. Branford has directed the Court to no evidence of retaliation against her or others that would make her failure to report reasonable under the circumstances. The WCSO cannot be liable for acts of sexual harassment by Sergeants Siemiller and Degman, who were Branford's supervisors.

Thus, the Court grants the Washington Defendants summary judgment against that portion of Branford's claim alleging a hostile work environment created by a supervisor's behavior. That does not mean, however, that the harassment by Sergeants Siemiller and Degman are not relevant at trial for other purposes, including to show that a hostile work environment existed or that there was an atmosphere in which coworkers could conclude that the WCSO did

not vigorously enforce its anti-harassment policy during the relevant time period. The parties may further address this issue in the context of motions *in limine*, which will be considered at the final pretrial conference.

### 2. Retaliation

Branford also alleges retaliation claims under Title VII as well as Or. Rev. Stat. §§ 659A.030(1)(f), 659A.199[10], 659A.203, 659A.230, and 659A.290. To succeed on a claim for retaliation, "a plaintiff must demonstrate that: '(1) she was engaging in protected activity, (2) the employer subjected her to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action.'" *Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002) (quoting *Bergene v. Salt River Project Agric. Improvement and Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001)).

Branford argues that, as a result of reporting Christensen's assault and other instances of sexual harassment, she suffered a number of adverse employment actions including: (1) being placed on paid administrative leave; (2) the overtime shifts she had signed up for were reassigned to other employees; (3) she was shunned by her coworkers; (4) her request for reassignment to MOU, Rover 1, and intake was initially denied; (5) rumors were started about Branford having sex with inmates; (6) she was sexually harassed by Ulrich; and (7) when she learned that the WCSO had obtained a copy of her cell phone data and she became upset, she was told to go home early. Branford does not address the issue of causation with respect to any of these alleged adverse employment actions. The Court concludes that Branford has failed to raise a genuine dispute of material fact as to any of her retaliation claims.

---

[10] The Washington Defendants also is entitled to summary judgment against Branford's claim under Or. Rev. Stat. 659A.199 because this statute does not apply to public employers; it only applies to private employers. *See Blanks v. Univ. of Or.*, 2018 WL 4924546 at *7 (D. Or. Oct. 10, 2018); *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077 (D. Or. 2015).

When the WCSO placed Branford on paid administrative leave immediately following her revelations to the PPB about Christensen's assault, this did not constitute an adverse employment action. The PPB initially suggested that Branford take paid leave because she was very distressed by the assault and the forthcoming restraining order hearing. Portland detectives called WCSO Undersheriff Mori to arrange for Branford to receive paid time off effective April 27, 2015. Branford called Mori and requested that she be marked as sick on the schedule. According to Branford, Mori promised her that she would receive paid time off work. ECF 94 at 23. Later, Branford was upset to learn that her paid leave would be ending on May 7, 2015. *See* ECF 82-1 at 29 ("I did not want to return."). Thus, even though Branford was placed on administrative leave as a direct result of revealing to the PPB Christensen's assault, Branford did not view this as an adverse employment action at the time. In fact, Branford wanted to remain on administrative leave beyond May 7, 2015.

Further, when Branford noticed that her overtime shifts had been reassigned, requiring her to sign up for other shifts if she wanted overtime, this did not constitute an instance of unlawful retaliation. Branford does not allege any facts to support a causal connection between her protected activity (reporting sexual harassment) and her overtime shifts being reassigned. A plaintiff who claims she has been retaliated against "must show that the protect[ed] activity constituted the 'but-for cause' of the employer's adverse employment action." *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1088 (D. Or. 2015). Oregon courts similarly apply a "but for" standard. *Id.* (citing *Hardie v. Legacy Health Sys.*, 167 Or. App. 425, 436 (2000)). Branford asserts that she does not know who removed her name from the overtime sign-up sheets. Sergeant Mackley was in charge of overtime scheduling, according to Branford, and she does not allege that Sergeant Mackley had any knowledge of her protected activity or

that any decision he made to reschedule her shifts was done with a retaliatory motive. Thus, Branford's claim that she was retaliated against for reporting workplace harassment by losing her scheduled overtime fails to make out a *prima facie* case of causation.

Also, being shunned by coworkers does not constitute retaliation. "Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000). *Brooks* notes that forcing employees to socialize might well run afoul of the First Amendment. *Id.* Similarly, a government employer has limited tools at its disposal to prevent employees from gossiping in the workplace, although the WCSO did undertake efforts to remind employees to refrain from gossip. *See* ECF 82-2 at 16. Branford alleges that the WCSO's efforts to curb gossip were ineffective, but this does not make workplace gossip by coworkers a retaliatory adverse employment action.

Branford also makes no allegations, and points to no facts, to support a claim that Sheriff Garrett initially denied her request to move to busier or more stressful shifts in retaliation for her protected activity. Although Branford lists this initial denial as an adverse employment action, she fails to explain any retaliatory motive or perceived causal connection between this initial denial and her protected activity. To the contrary, Sheriff Garrett stated that he was concerned that Branford working in a high-stress environment might be overwhelming for her. *See* ECF 82-2 at 19. Branford describes her requested posts as "the busiest, hardest in the jail." ECF 82-10 at 19. Branford has identified no evidence that Sheriff Garrett's reason that he initially denied her request—because he was concerned for Branford's mental and physical health—was a pretext for retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Branford stated that she had no information to suggest that the reason that Sheriff Garrett

initially denied her request was because she had complained about workplace harassment. ECF 102-3 at 10. Sheriff Garrett later granted Branford's reassignment request. Eventually, Branford requested to be transferred back to her regular shifts. None of this constitutes a retaliatory adverse employment action.

In addition, the rumors that Branford was sleeping with inmates do not amount to an adverse employment action. *See EEOC v. Parra*, 2008 WL 2185124 at *8 n.6 (D. Or. May 22, 2008) (noting that starting rumors is not an adverse employment action); *see also Brooks*, 229 F.3d at 929. Further, Branford has not argued that the rumors were *in retaliation* for reporting sexual harassment and not instead based on the fact that the WCSO was *actually investigating* instances of blonde jail employees having sex with inmates. Branford was blonde and worked in the jail. *See* ECF 96-2 at 27-28. She has failed to allege any causal link between her protected activity and these rumors.

Similarly, Branford does not point to any facts to suggest that Ulrich's motivations for sexually harassing her were retaliatory. *See Matsushita Elec. Indus., Co.*, 475 U.S. at 587 ("the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*") (emphasis in original) (quoting Fed. R. Civ. P. 56(d)). Branford has done no more than make a conclusory assertion that Ulrich's harassment was "retaliatory" without identifying any facts that support that conclusion.

Finally, when Sergeant Arrowood told Branford to go home after she was upset that WCSO internal affairs was looking at the contents of her cell phone, this did not constitute an adverse employment activity in retaliation for her protected activity. Branford does not allege that the reason Lieutenant Black told her to go home early, because she was upset about her cell phone contents being shared, was not the true reason for his advice and direction, and was

instead a pretext for retaliation. *See McDonnell Douglas*, 411 U.S. at 804. Branford admits that she was very upset about the contents of her phone being shared, and she does not suggest that Sergeant Arrowood told her to go home in retaliation for her earlier complaints about sexual harassment, and not because she was legitimately upset. Similarly, when Lieutenant Black asked Branford if she was interested in taking a job outside of the sheriff's office, this did not constitute an adverse employment action.

In summary, Branford has failed to raise a genuine dispute of material fact on any of her retaliation allegations under federal or state law. The Court grants the Washington Defendants' motion for summary judgment on Branford's claims of retaliation.[11]

### 3. Section 1983

The Court begins by noting that Branford is correct that the Washington Defendants have not moved for summary judgment against Branford's claim against Christensen under 42 U.S.C. § 1983. Christensen is not part of the Washington Defendants group in this lawsuit, and he is not represented by counsel for the Washington Defendants in this matter. Also, Christensen has not moved for summary judgment against any of Branford's claims.[12] Additionally, Branford has agreed to dismiss her 42 U.S.C. § 1983 claim against Washington County. Thus, regarding the

---

[11] Branford also claims that the County discriminated and retaliated against her based on her status as a victim of domestic violence in violation of Or. Rev. Stat. § 659A.290. Branford fails to allege any facts that suggest that she was treated differently or otherwise discriminated against based on her status as a victim of domestic violence. She argues that she was treated differently than one deputy who took administrative leave after a use of force incident in which he had shot an unarmed man, but Branford does not explain how the deputy who engaged in use of force is a relevant comparator. ECF 93 at 19-20. Branford also fails to explain which adverse employment actions she believes the WCSO took because of her status as a domestic violence victim. Branford also fails to allege that there was a causal link between any action taken by the WCSO and her status as a victim of domestic violence. Thus, the Court grants summary judgment to the Washington Defendants on this claim by Branford.

[12] Branford alleges that Christensen violated her rights under the Fifth and Fourteenth amendments, made applicable to local officers and entities by the Fourteenth Amendment.

Washington Defendants, only Branford's individual claims under § 1983 against Sheriff Garrett and Lieutenant Black remain.

"The doctrine of qualified immunity protects government officials from liability for civil damages." *Wood v. Moss*, 134 S. Ct. 2056, 2066-67 (2014); *Krainski v. Nevada ex. Rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017) (citation omitted) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) and *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity, however, is only an immunity from suit for damages, it is not an immunity from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id.* The second

step is to determine "whether the right was clearly established." *Id.* The constitutional issue, however, need not be addressed first in every case. *Pearson*, 555 U.S. at 227. Regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not clearly established or the officer could have reasonably believed that his particular conduct was lawful. *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Ziglar*, 137 S.Ct. at 1867. To be clearly established, "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent. *Id.* at 1866-67. (citations and quotation marks omitted). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (alteration in original). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & Cty.*

*of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc) ("[T]he specific facts of previous cases need not be materially or fundamentally similar to the situation in question."))).

The plaintiff bears the burden of making a showing that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). When considering whether qualified immunity applies, however, the court must resolve all factual disputes in favor of the party asserting the injury. *Ellins*, 710 F.3d at 1064.

Branford argues that Sheriff Garrett and Lieutenant Black violated her substantive and procedural due process rights, depriving her of her liberty and property interests, when they obtained a copy of Branford's cell phone contents and provided a copy to Washington County counsel Elmer Dickens, who then provided it to a private investigator working for the County. Branford's cell phone contents allegedly included intimate photographs of Branford that are not related to any investigation. Garrett and Black argue that they are entitled as a matter of law to qualified immunity both because their actions were constitutionally permissible and because no reasonable law enforcement officer would have been on notice that receiving the contents of Branford's cell phone from other law enforcement officers in the context of official investigations, after Branford voluntarily provided her phone to the PPB as part of its investigation, was unconstitutional. Branford responds that any reasonable law enforcement officer should have known that obtaining and distributing the private contents of a cell phone violated Branford's clearly established constitutional rights.

The United States Supreme Court recognizes a constitutional privacy interest in "avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977*); Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977). This type of privacy interest, often called, "informational privacy" is not unlimited. Although a government's accumulation of personal

information for public purposes may pose a threat to individual privacy, statutory or regulatory duties to avoid unwarranted disclosures of personal information are often sufficient to alleviate these privacy concerns. *Whalen*, 429 U.S. at 605.

In 2011, the Supreme Court assumed, without deciding, that the Constitution protects a right to informational privacy. The Court recognized that many courts had interpreted *Whalen* and *Nixon* to hold that the disclosure of at least some kinds of personal information should be subject to a test that balances the government's interests against the individual's interests in avoiding disclosure. *Nat'l Aeronautics and Space Amin. v. Nelson*, 562 U.S. 134, 147 n.9 (2011). The Ninth Circuit has held that the right to informational privacy "applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Planned Parenthood v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002). As all the parties recognize, this right is not absolute, "it is a conditional right which may be infringed upon a showing of proper governmental interest." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (quoting *Lawall*, 307 F.3d at 790)). In determining "whether the governmental interest in obtaining information outweighs the individual's privacy interest," *Seaton v. Mayberg*, 610 F.3d 530, 530 (9th Cir. 2010), courts may:

> balance the following factors to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest: (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Eden*, 379 F.3d at 551. The cell phone contained text messages that were relevant to WCSO's internal affairs investigation, and Branford does not allege that any unintentional disclosure of

the phone contents occurred. Based on the fact that the right to informational privacy is only conditional and may properly be infringed upon consideration of the government's interests under the totality of the circumstances, the Court concludes that Garrett and Black reasonably could have believed that their conduct in receiving the contents of Branford's cell phone and then providing a copy of that data to Washington County counsel, who then provided the contents to a private investigator working for the County for redaction purposes, was lawful.

Branford relies on *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963), to support her argument that any reasonable law enforcement officer would have known that Sheriff Garrett's and Lieutenant Black's conduct in obtaining and then distributing Branford's private information to County counsel would violate Branford's constitutional right to informational privacy. In *York*, the Ninth Circuit held that a sexual assault victim's right to bodily privacy was violated by a police officer who directed the victim to disrobe, photographed the victim in sexually suggestive poses that were unnecessary and unrelated to the investigation, and later distributed the photographs among the police department for no apparent and legitimate law enforcement purpose. *Id.* at 455. *York*, however, presents a much more egregious factual scenario than is found in the pending case. The photographs were already on Branford's cell phone when she gave consent to the PPB to make a copy of the phone's contents, and Branford does not dispute that the PPB shared her cell phone data with the WCSO for a legitimate law enforcement purpose.

Further, the Ninth Circuit has cautioned against construing the right to informational privacy too broadly. In *Davis v. Bucher*, 853 F.2d 718, 719-20 (9th Cir. 1988), the plaintiffs were an inmate and his wife. They sued a state prison guard under § 1983 after the guard viewed and shared nude photos of Mrs. Davis. During the course of transferring Mr. Davis from one

correctional facility to another, Bucher inventoried Mr. Davis's possessions. Among those

possessions, Bucher found an envelope containing four nude photos of Mrs. Davis. Bucher

viewed the photographs himself and then showed them to two other inmates. The Ninth Circuit

affirmed the district court's conclusion that no right of privacy existed under the circumstances.

*Id.* The Ninth Circuit held:

> The Davises seek a broad construction of that right. Their theory is
> that the Fourteenth Amendment houses an interest in avoiding the
> unconsented and unwarranted disclosure of intimate photographs
> by the state, and that this interest was violated by Bucher's conduct
> in exhibiting the photos to others . . . . This theory cannot be
> sustained.

*Davis*, 853 F.2d at 719–20.

In light of *York* and *Davis*, the Court cannot conclude in this case that reasonable law

enforcement officers in the position of Sheriff Garrett's and Lieutenant Black should have

known that obtaining and sharing the data contained in Branford's cell phone violated a clearly

established constitutional right of privacy. *See Baker v. Racansky*, 887 F.dd 183, 187 (9th

Cir. 1989) (holding that "if the existence of a right or the degree of protection it warrants in a

particular context is subject to a balancing test, the right can rarely be considered clearly

established, at least in the absence of closely corresponding factual and legal precedent")

(quotation marks omitted); *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998) (noting that

the Ninth Circuit has recognized a "self-evident tenet of qualified immunity jurisprudence,"

namely, "the difficulty of divining clearly established legal principles from multifactor balancing

tests"). As a result, the Court concludes that Sheriff Garrett and Lieutenant Black are entitled to

qualified immunity from suit by Branford under 42 U.S.C. § 1983.

Branford also alleges that Sheriff Garrett and Lieutenant Black violated her procedural

due process rights because they deprived her of the property interest she has in her photoraphs.

Branford does not cite any cases in support of the proposition that she has a constitutionally-protected property interest in the photographs contained on her cell phone. Branford, at all times, retained her own personal copy of the entirety of her cell phone data. Thus, she was never actually deprived of the photographs and the other data and material in question. Branford also does not argue that the PPB's seizure of her cell phone data, and its transfer to the WCSO, violated her Fourth Amendment rights. The Ninth Circuit has held that, "when seizing property for criminal investigatory purposes, compliance with the Fourth Amendment satisfies pre-deprivation procedural due process as well." *Sanders v. City of San Diego*, 93 F.3d 1423, 1429 (9th Cir. 1996). Thus, the Court cannot conclude in this case that a reasonable law enforcement officer in the position of Sheriff Garrett and Lieutenant Black would have known that receiving and sharing the data contained within Branford's cell phone violated a clearly established right to procedural due process.

Further, the Washington Defendants previously sought from this Court an order allowing them to return to Branford all of Branford's cell phone data in the possession, custody, or control of the WCSO, except for specific portions that the Washington Defendants stated they are required to retain under Oregon public records law. ECF 49. The Court granted that motion, over Branford's objection, and the cell phone contents are no longer in the possession of the Washington Defendants. ECF 56. The Court grants the Washington Defendants' motion for summary judgment against Branford's § 1983 claims against the Washington Defendants.

### 4. Negligent Supervision and Hiring

Branford also seeks to hold Washington County liable for negligence in hiring and failing adequately to supervise Christensen. Branford correctly identifies that liability attaches when an employer "negligently plac[es] an employee with known dangerous propensities, or dangerous propensities which could have been discovered by a reasonable investigation, in a position where

it is foreseeable that he could injure the plaintiff in the course of the work." *Chesterman v. Barmon*, 82 Or. App. 1, 4 (1986). Branford does not, however, identify any evidence that Christensen had known dangerous propensities before his attack on Branford. Christensen underwent a standard background check and evaluation process when he was hired by Washington County, and no criminal history was found. Further, Christensen was required to undergo medical and psychological examinations before he could join the WCSO, which he passed. ECF 80 at 3. Sheriff Garrett explained in his deposition that, before receiving the anonymous email about Christensen's misconduct, Sheriff Garrett did not have any knowledge of Christensen's propensity towards violence against women. ECF 82-2 at 21. Branford does not provide any evidence that Christensen has been violent on other occasions, other than the March 7, 2015 choking incident. Branford also has produced no evidence to suggest that Washington County knew or should have known about Christensen's dangerous tendencies before that event. Thus, the Court grants Washington County summary judgment against Branford's claim of negligent supervision and hiring.

### 5. Invasion of Privacy

The Washington Defendants also move for summary judgment against Branford's claim of invasion of privacy, which she clarifies is a claim under Or. Rev. Stat. § 30.865.[13] That statute creates a cause of action for invasion of personal privacy if a plaintiff can establish that:

---

[13] Branford's First Amended Complaint did not mention the invasion of privacy statute and the Washington Defendants reasonably assumed that Branford intended to make a common law claim for invasion of privacy and addressed only a common law claim in its motion for summary judgment. After Branford clarified that she intended her claim to be based on the Oregon statute, the Washington Defendants addressed her statutory arguments. The Court considers the Washington Defendants' statutory arguments, even though raised for the first time in a reply brief, because before Branford's response to the Washington Defendants' motion for summary judgment, the Washington Defendants were not on notice that Branford intended her claim to be based on an Oregon statute as opposed to the Oregon common law.

> Without the consent of the plaintiff, the defendant disseminated a photograph, motion picture, videotape or other visual recording of the plaintiff in a state of nudity, and the defendant knew that at the time the visual recording was made or recorded the plaintiff was in a place and circumstances where the plaintiff had a reasonable expectation of personal privacy.

Or. Rev. Stat. § 30.865(d). Because Lieutenant Black shared the contents of Branford's cell phone with County counsel (and, ultimately, a private investigator working for the County), Branford argues that the County's conduct meets all of the requirements of Or. Rev. Stat. § 30.865(d) and the County's motion for summary judgment should be denied.

Under Oregon law, liability of public bodies is governed by Or. Rev. Stat. § 30.265, which holds that "[t]he sole cause of action for a tort committed by officers, employees, or agents of a public body acting with the scope of their employment or duties and eligible for representation and indemnification . . . is an action under Or. Rev. Stat. 30.260 to 30.300. . . . No other form of civil action is permitted." Or. Rev. Stat. § 30.265(2). Branford does not seek to hold Washington County liable under the statutes governing liability for public bodies, and as no other form of civil action is permitted, her claim for invasion of personal privacy must fail as a matter of law.

In addition, the criminal statutes for invasion of privacy in the first and second degrees, which criminalize making or recording an intimate photograph without someone's consent, contain an exception for activities "undertaken in the course of *bona fide* law enforcement or corrections activity or necessary to the proper functioning of the criminal justice system." Or. Rev. Stat. § 163.702. The PPB and the WCSO investigations into criminal and inappropriate activities by law enforcement officers were undertaken in the course of *bona fide* law enforcement activity and were necessary to the proper functioning of the criminal justice system. The exemption provided for in the criminal statutes is logical and necessary to avoid imposing

criminal liability on law enforcement officers who are carrying out important government functions. A similar exemption should be implied in the civil context. Accordingly, the sharing of information for legitimate law enforcement purposes may not give rise to liability under Or. Rev. Stat. § 30.865.

The Oregon invasion of privacy statute, if interpreted the way that Branford argues, would make all law enforcement agencies potentially civilly liable every time they share information internally and among officers and attorneys in the course of a criminal investigation, if that information happens to also contain private images. Every time local police officers seize a drug trafficker's cell phone and turn it over to the FBI, if that cell phone also contains sensitive photographs, under Branford's interpretation of the statute, the local police could be subject to civil liability under this statute. The Oregon legislature could not have intended such an absurd result. *See* John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2395 (2003). Accordingly, the Court declines to interpret Or. Rev. Stat. § 30.865 to impose liability on law enforcement agencies who share lawfully-obtained information among officers, attorneys, and investigators for a legitimate law enforcement purpose. The Court grant summary judgment in favor of the Washington Defendants against Branford's claim of invasion of privacy.

### 6. WCSO Liability for Christensen's Battery

The doctrine of *respondeat superior* establishes that "an employer is liable for an employee's torts when the employee acts within the scope of employment." *Chesterman v. Barmon*, 305 Or. 439, 442 (1988). No malfeasance or negligence on the part of the employer is required to hold the employer liable for the torts of its employee. *Id.* Branford alleges that Christensen's act of entering her home and choking her were tortious acts committed with the scope of Christensen's employment for the WCSO.

Three requirements must be met in order to hold an employer liable for the conduct of its employee. These requirements are: "(1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform." *Id.*

Branford argues that her relationship with Christensen was akin to a relationship between a "youth pastor, friend, confessor, and priest" to a young plaintiff, or to the relationship between a Boy Scout leader and a troop member. *See Fearing v. Bucher*, 328 Or. 367, 372 (1999); *Lourim v. Swensen*, 328 Or. 380, 386 (1999). In *Fearing*, the Oregon Supreme Court found that "the priest's conduct in cultivating a trust relationship with the plaintiff was motivated, at least in part, by a desire to further the interests of the Archdiocese, that the conduct was of a kind that the priest was hired to perform, and that the conduct led to the sexual assaults." *Lourim*, 328 Or. at 386.

Christensen, however, was not hired to cultivate an intimate relationship with Branford, and an intimate relationship with Branford would not further the interests of the WCSO. The WCSO hired Christensen to carry out the duties of a patrol sergeant in the Sheriff's office. Christensen's intimate relationship with Branford was not connected to, and not in furtherance of, the duties he was required to perform as a patrol sergeant.

*Chesterman* is a much more analogous case. *Chesterman* involved a plaintiff's attempt to hold an employer liable for its employee entering the plaintiff's house and assaulting her. *Chesterman*, 305 Or. at 443. In *Chesterman*, the employee worked for a construction company that provided remodeling bids, and entering plaintiff's home and sexually assaulting plaintiff were not within the scope of his employment. *Id.* at 441. Although it appears as though part of

Christensen's job as a patrol deputy required him to travel around Washington County, it was not part of his job duty to enter Branford's home, even while he was on duty. It was certainly not part of Christensen's job to assault and choke Branford, nor to pressure her into maintaining a sexual relationship with him, and Christensen's sexual relationship with Branford could not possibly been motivated by a desire to serve Washington County. Accordingly, there is no genuine dispute of fact that Christensen's act of entering Branford's house and choking her was outside the scope of his employment. This action was "outside the limits of time and space, [was] not motivated by a purpose to serve the employer and [was] not of a kind which" Christensen was hired to perform. *Chesterman*, 305 Or. at 443. The County is not vicariously liable for Christensen's conduct. The Court grants the County's the motion for summary judgment against Branford's claim based on Christensen's assault.

**B. Branford's Motion for Partial Summary Judgment Against Christensen**

Branford cross-moves for partial summary judgment on her battery claim against Christensen. In her declaration, Branford describes how Christensen "grabbed [her] by the throat, choked [her], and strangled [her] cutting off [her] airway.' ECF 94 at 18. In 2016, Christensen pled guilty to strangulation constituting domestic violence. ECF 86-1 at 10. Christensen did not respond to Branford's partial motion for summary judgment. In his answer to her complaint, Christensen admitted "that Defendant Christensen grabbed Plaintiff's hair with one hand and put his other hand around her throat." ECF 21 at ¶ 24.

The elements of battery under Oregon law are:

> [T]he conduct which brings about the harm must be an act of volition on the actor's part, and the actor must have intended to bring about a harmful or offensive contact or put the other party in apprehension thereof. It is not necessary that the contact do actual physical harm—it is sufficient if the contact is offensive or insulting.

*Johnson v. Jones*, 269 Or. App. 12, 17 (2015) (quoting *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249 (1976)). Christensen does not dispute that he intentionally strangled Branford or that his contact was offensive. He admits that he put his hand around her throat and that he pleaded guilty to strangulation constituting domestic violence. ECF 21 ¶33. There is no genuine dispute of material fact as to whether Christensen's conduct meets the elements of battery under Oregon law. Accordingly, Branford's motion for partial summary judgment is granted.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART the Washington Defendants' Motion for Summary Judgment (ECF 79) and GRANTS Branford's Partial Motion for Summary Judgment against Defendant Christensen (ECF 84). Thus, the claims that remain for trial are: (1) Branford's sex discrimination claims under federal and state law against Washington County for maintaining a hostile work environment based on the actions of Branford's coworkers at the WCSO (Plaintiff's First and Second Claims); (2) Branford's § 1983 claim against Christensen (Plaintiff's Ninth Claim); (3) Branford's battery claim against Christensen (Plaintiff's Thirteenth Claim, damages only); and (4) Branford's intentional infliction of emotional distress claim against Christensen (Plaintiff's Fourteenth Claim).

**IT IS SO ORDERED**.

DATED this 2nd day of May, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge